IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RAYSHON L. BLACK,<br><br>               Petitioner,<br><br>vs.<br><br>WARDEN NEIL TURNER,<br><br>             Respondent. | CASE NO. 1:21-cv-0354<br><br>DISTRICT JUDGE<br>BRIDGET MEEHAN BRENNAN<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**REPORT &<br>RECOMMENDATION** |

Rayshon L. Black filed a Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus. Doc. 1. Black is currently in custody at the North Central Correctional Complex serving an aggregate twelve-year sentence imposed by the Cuyahoga County Court of Common Pleas in State v. Black, Case Nos. CR-17-615294-A and CR-17-614959-A. The Court referred this matter to a Magistrate Judge under Local Rule 72.2 for the preparation of a Report and Recommendation. For the following reasons, I recommend that the Court dismiss Black's petition.

### Summary of underlying facts

In habeas corpus proceedings brought under 28 U.S.C. § 2254, factual determinations made by state courts are presumed correct. 28 U.S.C. § 2254(e)(1). "This presumption also applies to the factual findings that [a] state appellate court makes on its review of the state trial record." *Johnson v. Bell*,

525 F.3d 466, 474 (6th Cir. 2008). The petitioner has the burden of rebutting

that presumption by clear and convincing evidence. *Id*.

The Ohio Court of Appeals for the Eighth Appellate District summarized

the facts underlying Black's conviction as follows:

> {¶ 5} T.S., who was 21 years old at the time of trial, has cerebral palsy due to medical complications suffered at birth. Because of her cerebral palsy, she has difficulty speaking clearly.

> {¶ 6} Alicia O'Neill ("O'Neill"), a speech language pathologist with the Cuyahoga County Board of Developmental Disabilities, testified concerning her interaction with the victim, T.S. O'Neill received a referral in 2017 from an employment and planning support administrator at the board to assist T.S. in communicating with potential employers. O'Neill testified that T.S.'s cerebral palsy has caused a motor speech impairment. Because of this impairment, T.S. has difficulty speaking clearly and she could not effectively communicate with potential employers. O'Neill explained that T.S. can communicate verbally, but "it can be difficult for others to understand what she is saying, especially at the conversational level." O'Neill therefore obtained equipment such as a computerized touch pad to help T.S. communicate.

> {¶ 7} T.S. testified at trial with the assistance of her touch pad device. In 2016, at the time of the alleged incident, T.S. was living in a home on Linwood Avenue with her mother, Priscilla Black ("Priscilla"), and Priscilla's husband, the defendant. T.S.'s brothers also lived there.

> {¶ 8} T.S. testified that on August 4, 2016, she was heading downstairs from her bedroom to get a drink from the kitchen when Black opened the door of his bedroom, grabbed T.S. by the arm, and pulled her into his bedroom. T.S. told Black to "get off me" and "leave me alone." She stated that Black "kept

grabbing me, and I was yanking away, telling him to get off of me, but * * * my body can't —." T.S. testified that she was not strong enough to fight her stepfather off. T.S. further stated that after Black got her into his bedroom, he put her on the bed, took off her shorts and underpants as well as his shorts, so that he was naked from the waist down, and he "stuck his penis in [her] vagina." T.S. repeatedly told Black to get off of her. According to T.S., at one point, her mother walked in the room and said, "Oh my God * * * you all can't keep doing what you doing" and then left the room. Black eventually stopped, and T.S. left the room to talk to her mother, but her mother would not listen to her.

{¶ 9} Thereafter, T.S. took a shower, placed the clothing she was wearing into the laundry, and later washed her clothes. The next morning, T.S. sent a text message to her stepmother, TaJuan Hatcher ("Hatcher"), stating:

> [Good morning] mom when u get a chan[ce] may u or my dad call me please something happen[ed] to me last night and I [know] that my mom don't believe and what I told her I ask[ed] her not to tell anyone but I [know] she going to say something so if u can may u or my dad please call me thank you this is seri[ous].

{¶ 10} Hatcher testified that when she received T.S.'s text she was at work, and she let T.S. know that she would call her when she got home. She testified that she did not realize how serious the matter was.

{¶ 11} T.S. also called her father, Le.S., and left him a voicemail message asking him to call her back. T.S. told her father in the message that she needed to talk to him about something serious. T.S.'s father testified that T.S. called him between midnight on August 6, 2016, and the early morning hours of August 7, 2016, but because he is "not really a phone person," he did not check his voicemail until later in the day on Sunday, August 7, 2016. Le.S. testified

3

that although T.S. did not tell him in the message what happened, she let him know that it was "serious." Le.S. attempted to return his daughter's call but the call did not go through. He then saw T.S. two days later, when T.S.'s sister dropped her off at his home.

{¶ 12} On Sunday, August 7, 2016, T.S. went to church with her friend Marcus Kincaid ("Kincaid") and his grandmother. After church, T.S. relayed to Kincaid that something bad had happened to her a couple of days before. Kincaid testified that after church, T.S. was upset and crying.

{¶ 13} T.S. stayed with Kincaid until her sister could pick her up. After her sister picked her up, T.S. stayed with her sister for a couple of days and told her what had happened. Then on August 9, 2016, T.S.'s sister brought T.S. to her father and stepmother's house, where T.S. told her parents what had happened with Black. Hatcher testified that when T.S. had come over that Sunday, T.S. was upset and "scared to talk," but she eventually told Hatcher and Le.S. that her stepfather raped her. Hatcher took T.S. to the hospital but T.S. was unable to get a sexual assault examination.

{¶ 14} Thereafter, Hatcher and Le.S. drove T.S. to the police station to report the rape but were not able to meet with an officer, so they returned home. Because T.S. needed her hair done and she needed a new phone, Le.S. suggested that T.S. go to the bank and get her money. Le.S. testified that he had helped initiate a lawsuit against the hospital when T.S. was born due to the hospital's alleged negligence and that T.S. ultimately received a medical malpractice settlement. He understood that T.S. had an administrator from the probate court to manage T.S.'s settlement funds until she turned 18 years old. Neither he nor Hatcher knew the amount of the settlement.

{¶ 15} When Le.S. and T.S. went to the bank, they learned that T.S. "had no money." Le.S. contacted

4

T.S.'s attorney to inquire about the funds, to "find out what happened to her money." Thereafter, on August 15, 2016, Le.S. and Hatcher brought T.S. to the police station for the second time to file a police report concerning the rape. They also reported the missing money from T.S.'s account, with the attorney's assistance.

{¶ 16} Jerry Kent, a forensic auditor with the Cuyahoga County Board of Developmental Disabilities, testified regarding his investigation into T.S.'s account, as he had become aware of "questionable expenditures." Through his investigation, he learned that a joint checking account between T.S. and T.S.'s mother, Priscilla, had been set up from T.S.'s trust fund. He discovered that the monies located in this joint account with her mother, totaling $101,000, had been transferred to her mother's own personal account in July 2015, when T.S. was 18 years old. Kent testified that T.S.'s funds were used to purchase items not typically used for an individual's basic care and support, including: a large quantity of alcohol; several automobiles, including a tow truck; and "heavy" auto insurance. By August 2016, both T.S.'s account and Priscilla's personal account had been depleted. Priscilla testified that she started a towing business with her husband, using funds from the joint account.

{¶ 17} Le.S. testified that at some point after the incident with Black, Priscilla and Black moved out of the Linwood Avenue home. And T.S. testified that she learned after the incident that she owned the Linwood house in which she lived with her mother and stepfather.

{¶ 18} On behalf of the defense, Priscilla testified that T.S. can "scream as loud as I can," but on August 4, 2016, Priscilla did not hear any screaming or yelling. T.S.'s brothers testified that they do not remember anything unusual about T.S.'s demeanor on or around August 4, 2016, and she did not seem upset. They also testified that T.S. did not confide in them about that day. T.S.'s younger brother, who

> was home on the day of the incident, stated that he did not hear any yelling that day. T.S.'s older brother testified that one Sunday, T.S. went to church with Kincaid and his grandmother and never returned home.

*State v. Black*, 149 N.E.3d 1132, 1135–37 (Ohio Ct. App. 2019).

## Procedural background

*Trial court proceedings*

In March 2017, a Cuyahoga County grand jury issued a three-count indictment charging Black with rape, in violation of Ohio Revised Code § 2907.02(A), kidnapping, in violation of Ohio Revised Code § 2905.01(A)(4), and gross sexual imposition, in violation of Ohio Revised Code § 2907.05(A)(5). Doc. 9-1, at 1–2. The kidnapping charge included a sexual motivation specification under Ohio Revised Code § 2941.147(A). *Id*. at 2.

Black pleaded not guilty. Doc. 9-1, at 3. Black's case initially proceeded to trial in March 2018. Doc. 9-2, at 6. During the trial, however, the State moved to the amend the indictment. *Id*. at 357. After the trial court granted the State's motion, Black's counsel asked the court to discharge the jury. *Id*. The court granted the motion. *Id*. at 358.

Black's rescheduled trial began in late May 2018. Doc. 9-2, at 390. During his opening statement, Black's counsel suggested that T.S. was motivated to lie about the rape. He said:

> [W]e … know … [that] she learned that … settlement money that she expected to have when she turned 18 wasn't there. You also are going to learn that the police report associated with the rape

6

> also talks about the theft. So if you want a motive for somebody to say something, there it is. The million dollar settlement or whatever it is that she expected to be receiving at 18 [is] not there.[1]

*Id*. at 679.

The State's first witness, Marcus Kincaid, was T.S.'s boyfriend in high school. Doc. 9-2, at 682. During his direct examination, the following happened:

> Q. … Do you remember going to church with [T.S.] about two years ago on a Sunday in August of 2016 and her telling you about something that had happened to her? She told you this after church that it happened a little bit before. Do you remember that?
>
> A. Yes.
>
> Q. What was she like when she was telling you what it was she told you? Was she happy? Was she sad? What did she seem like?
>
> A. Sad.
>
> Q. Was she crying?
>
> A. Yes.
>
> Q. Was she able to tell you when it had happened? I mean, could you say it was a couple of days ago or a couple of months ago?
>
> A. Days.
>
> Q. Couple of days. So a couple of days before August 7th there was something that happened to you that she told you after church that day?
>
> A. Yes.
>
> Q. Without telling us what she told you, was she able to describe the events that happened to her that were upsetting her?

---

[1]     T.S. was born with cerebral palsy, which allegedly resulted from the negligence of the doctor who delivered her. *See* Doc. 9-2, at 716. The doctor reached a settlement agreement with T.S.'s family. *Id*. at 716–17.

A. No.

Q. So let me ask that a different way. I'm not sure you understood my question.

Did she tell you what happened to her or did she just say something bad happened to me?

|                   |                                     |
|-------------------|-------------------------------------|
| MR. CHRISTMAN:    | Objection, your Honor.              |
| THE COURT:        | Overruled. You may answer, sir.     |

Q. Was [T.S.] able to tell you what happened to her or did she just say something bad happened to her?

A. Something bad.

Q. And without telling us exactly what she said, did she say who it was who had done something to her?

A. No.

Doc. 9-2, at 683–85.

The State also called Tajuan Hatcher to testify. Doc. 9-2, at 701. Hatcher was the fiancé of T.S.'s father, Le.S. *Id*. The prosecutor asked Hatcher about a text message she received from T.S. on August 5, 2016. *Id*. at 703. He then presented her with a copy of the text and asked her to read it to the jury. *Id*. at 706–07. According to Hatcher's testimony, the text said:

> Good morning, mom. When you get a chance, -- she put change -- but when you get a chance, can you or my dad call me please. Please. Something happened to me last night and I know that my mom don't believe, and when I told her, I asked her to not tell anyone, but I know she is going to say something. So if you can, may you or my dad please call me. Thank you. This is serious.

*Id*. at 707.

The State later called Le.S. to testify. Doc. 9-2, at 730. During his testimony, the following occurred:

> Q. Did [T.S.] tell you at that point what it was that had happened to her?
>
> A. Basically I think she --
>
> Q. And hang on. Without telling us what she told you, I want to be clear. My question is, was she able to tell you happened?
>
> A. I wanted to say, I mean, she told me, she told me, but her sister explained it to me better than, you know, what was really going on.
>
> Q. So was it your understanding that she had already told Teisha what happened?
>
> A. Yes, because that's who she was with.

*Id*. at 739–40.

At the conclusion of the trial, the jury found Black guilty of rape and kidnapping committed with sexual motivation. Doc. 9-2, at 1033–34; *see* Doc. 9-1, at 4. Soon after, Black filed a pro se "motion to disqualify and recuse counsel." Doc. 9-1, at 5. The trial court granted the motion, construed as a motion to withdraw, and appointed new counsel. *Id*. at 6. On November 26, 2018, the trial court sentenced Black to concurrent 10-year terms of imprisonment on the rape and kidnapping counts. *Id*., at 7. The court ordered that the sentence would run consecutive to a sentence imposed in a separate case. *Id*.

*Direct appeal*

Black's counsel filed timely a notice of appeal with Ohio's Eighth District Court of Appeals. Doc. 9-1, at 10–11. In his supporting brief, he raised three assignments of error:

> I. The trial court reversibly erred in admitting hearsay into evidence in the form of prior consistent statements of the alleged victim without proper application of Evid.R. 801(D)(1).

> II. Defense counsel provided ineffective assistance of counsel by failing to object to hearsay evidence presented at trial.

> III. The manifest weight of the evidence did not support a conviction of Appellant.

*Id*. at 33.[2] The court of appeals affirmed on December 5, 2019. *Black*, 149 N.E.3d 1132.

On February 18, 2020, Black filed with the Ohio Supreme Court an untimely pro se notice of appeal, together with a motion to file a delayed appeal. Doc. 9-1, at 88–95. The Ohio Supreme Court granted the motion and gave Black 30 days to file a memorandum in support of jurisdiction. *Id*. at 120.

In his memorandum in support of jurisdiction, Black raised three propositions of law:

> I. The trial court reversibly erred in admitting hearsay into evidence in the form of prior consisten statements of the alleged victim without proper application of Evid.R. 801(D)(1).

---

[2]    In this report and recommendation, all of Black's claims of error are reproduced as written.

II. Defense counsel provided ineffective assistance of
counsel by failing to object to hearsay evidence
presented at trial.

III. The manifest weight of the evidence did not
support a conviction of Appellant.

Doc. 9-1, at 126. On June 23, 2020, the Ohio Supreme declined under rule
7.08(B)(4) of its rules of practice to accept jurisdiction. *Id*. at 137.

*Post-conviction petition*

On February 21, 2020, Black filed in the trial court a pro se "motion for
leave of time to file postconviction" petition.[3] Doc. 9-1, at 390. In his motion, he
stated that because he was "currently filing [an] application" under Ohio
Appellate Rule 26(B) to reopen his direct appeal, he "lack[ed] [the] time to file
his Postconviction petition." *Id*. Black asserted, however, that he intended to
file it and thus asked for 30 additional days to do so. *Id*. The trial court denied
Black's motion in late February 2020. *Id*. at 391.

*Application to reopen appeal*

On March 6, 2020, Black filed a pro se application under Ohio Appellate
Rule 26(B) to reopen his appeal.[4] Doc. 9-1, at 138–47. Black asserted that his

---

[3]    The Warden mistakenly asserts that Black filed his post-conviction
petition in 2021. *See* Doc. 9, at 10.

[4]    Rule 26(B)(1) provides:

A defendant in a criminal case may apply for
reopening of the appeal from the judgment of
conviction and sentence, based on a claim of
ineffective assistance of appellate counsel. An
application for reopening shall be filed in the court

appellate counsel had been ineffective for not raising three assignments of error on appeal:

> 1. The prosecution engaged in misconduct by making inaccurate statements and asking leading questions that deprived Black of a fair trial.
>
> 2. There was insufficient evidence to support a conviction.
>
> 3. The convictions were against the manifest weight of the evidence because the verdicts were inconsistent.

Doc. 9-1, at 138.

In denying Black's application, the court of appeals first noted that under Rule 26, an application to reopen "claiming ineffective assistance of appellate counsel [must] be filed within 90 days from journalization of the decision unless the applicant shows good cause for filing at a later time." *State v. Black*, 2020-Ohio-3278, 2020 WL 3118903, at *1 (Ohio Ct. App. June 10, 2020). Given that the court of appeals issued its decision on Black's direct appeal on December 5, 2019, Black's application was due no later than March 4, 2020. *Id*. Because he filed his application on March 6, 2020, it was "untimely on its face." *Id*.

---

> of appeals where the appeal was decided within ninety days from journalization of the appellate judgment unless the applicant shows good cause for filing at a later time.

If the application is filed outside the 90-day period in rule 26(B)(1), the applicant must show good cause for the untimely filing. Ohio App. R. 26(B)(2)(b).

As to good cause, Black had "argue[d] that the prison delays, not his lack of diligence, caused the untimely filing." *Id.*; *see* Doc. 9-1, at 305–06. "[D]elays in the mail," however, "do not constitute good cause for untimely filing." *Black*, 2020 WL 3118903, at *1. And later enacted COVID-19-based tolling rules did not apply to Black's application because those rules were effective after the due date for his application. *Id.* Finally, "after reviewing the application, the court conclude[d] that Black's assignments of error d[id] not present a genuine issue as to whether he was deprived of the effective assistance of appellate counsel." *Id.*

Black filed a notice of appeal with the Ohio Supreme Court on July 21, 2020. Doc. 9-1, at 327–28. In his memorandum in support of jurisdiction, Black raised two propositions of law:

> 1. The court of appeals erred by not finding good-cause was shown by Appellant, when Appellant's 26(B) application was delayed only due to ODRC violating its own policy, but for the violation, Appellant's 26(B) application would have been timely.

> 2. Appellant was provided ineffective assistance of appellate counsel, when counsel supported the entire review on a Rules of Evidence violation that clearly and convincingly by law is not applicable to Appellant's case, thus Appellant did not receive a fair appellate review.

*Id.* at 338. On October 13, 2020, the Ohio Supreme Court declined under rule 7.08(B)(4) of its rules of practice to accept jurisdiction. *Id.* at 389.

13

*Federal habeas proceedings*

Black filed his pro se petition for writ of habeas corpus on February 1, 2021. Doc. 1, at 16; *see Houston v. Lack*, 487 U.S. 266, 270 (1988) (holding that an imprisoned petitioner's petition is deemed filed when he places it in his prison's mailing system). He raises the following grounds for relief:

> GROUND ONE: Petitioner was deprived his Constitutional right to effective assistance of appellate counsel on his first appeal as of right, as guaranteed by the 6th and 14th Amendments in the U.S. Constitution and provided for in Evitts v. Lucy (1985), 469 U.S. 387, 396.
>
> > *Supporting Facts*: (1) Appellate Counsel based entire appeal only on an Ohio Rule of Evidence violation in which; Clearly and Convincingly, and a matter of law, not applicable to Petitioner's trial, appeal, and or conviction, thus deprived Petitioner of a full and fair direct appeal as of right. (2) Appellate counsel failed to raise appropriate issues.
>
> GROUND TWO: Petitioner was deprived his constitutional right to a fair trial when the prosecution engaged in an erroneous pattern of misconduct.
>
> > *Supporting Facts*: Petitioner's trial was fundamentally unfair due to the State's erroneous conduct throughout the trial in which combined to deprive Petitioner of his Due Process rights and his right to a fair trial. Prosecution throughout the trial continued to lead witnesses, supply and provided witnesses answers, bring up prior bad acts and pending charges in which no guilty finding had been made, incited the passions and prejudices of the jury and further asserted their own opinion as to the

14

Witnesses credibility thus voguing for the witnesses credibility.

GROUND THREE: Petitioner's verdict of guilty cannot be upheld as there was not legally sufficient evidence to sustain the conviction, meeting beyond reasonable doubt standard.

*Supporting Facts*: Petitioner's verdict as Rape and Kidnapping cannot stand as the evidence does not weigh beyond a reasonable doubt in favor of a conviction and not meeting the required elements of the offenses. Further, the State of Ohio's legal reason for affirming convictions is in conflict with the verdict itself and the jury's reasoning reaching the verdict.

Doc. 9, at 6, 8, 9. Respondent Warden Neil Turner filed a return of writ in response. Doc. 9. Black filed a traverse. Doc. 13. Warden Turner filed a reply to the traverse. Doc. 14.

## Legal Standard

Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, § 104, 110 Stat. 1214 (AEDPA or the 1996 Act), habeas petitioners must meet certain procedural requirements to have their claims reviewed in federal court. *Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006). "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). Failure to

exhaust applies when state remedies are "still available at the time of the federal petition." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). But when "state court remedies are no longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." *Id.*

*Exhaustion*

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); *Robinson v. Horton*, 950 F.3d 337, 343 (6th Cir. 2020). A state defendant with federal constitutional claims must "fairly presen[t]" those claims to the state courts before raising them in a federal habeas corpus action. *Robinson*, 950 F.3d at 343 (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)); *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006). A constitutional claim for relief must be presented to the state's highest court to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845–48 (1999); *Caver v. Straub*, 349 F.3d 340, 345 (6th Cir. 2003). And a habeas petitioner must "present[] both the factual and legal basis for [the] claims to the state courts." *Hanna v. Ishee*, 694 F.3d 596, 606 (6th Cir. 2012). This means that the "petitioner must present his claim to the state courts as a federal constitutional issue—not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984). "'[G]eneral allegations of the denial of rights to a "fair trial" and "due process" do not "fairly present claims" that

16

specific constitutional rights were violated.'" *Hand v. Houk*, 871 F.3d 390, 418 (6th Cir. 2017) (quoting *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006)).

*Procedural default*

Procedural default may occur in two ways. *Williams*, 460 F.3d at 806. First, a petitioner procedurally defaults a claim by failing "to comply with state procedural rules in presenting [the] claim to the appropriate state court." *Id.* In *Maupin v. Smith*, the Sixth Circuit directed courts to consider four factors when determining whether a claim is barred on habeas corpus review due to a petitioner's failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to the petitioner's claim and whether the petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for failing to follow the rule and actual prejudice by the alleged constitutional error. 785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court and pursue that claim through the state's 'ordinary

appellate review procedures.'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see Woolbright v. Crews*, 791 F.3d 628, 631 (6th Cir. 2015) ("When a petitioner has failed to fairly present … claims to the state courts and no state remedy remains, [the] claims are considered to be procedurally defaulted."). While the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner, *see Coleman v. Thompson*, 501 U.S. 722, 732 (1991), a petitioner's failure to have the federal claims considered in the state courts constitutes a procedural default of those claims that bars federal court review. *Williams*, 460 F.3d at 806.

To overcome a procedural bar, a petitioner must show cause for the default and establish that actual prejudice resulted from the alleged violation of federal law, or show that a fundamental miscarriage of justice will result if the petitioner's claims are not considered. *Coleman*, 501 U.S. at 750.

*Merits review*

To obtain habeas relief under 28 U.S.C. § 2254, a petitioner must show either that the state court decision (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the" United States Supreme Court ("contrary to" clause); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" ("unreasonable application" clause). 28 U.S.C. § 2254(d).

18

Under the *contrary to* clause, a federal habeas court may grant a writ if the state court "arrives at a conclusion opposite to that reached by the [United States Supreme] Court on a question of law or [based on] a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the *unreasonable application* clause, a federal habeas court may grant the writ "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "Clearly established federal law" refers to the holdings, not dicta, of the Supreme Court's decisions as of the time of the relevant state court decision, and legal principles and standards flowing from Supreme Court precedent. *Id.* at 412; *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005). A state court is not required to cite Supreme Court precedent or reflect an awareness of Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts" such precedent. *Early v. Packer*, 537 U.S. 3, 8 (2002); *Lopez v. Wilson*, 426 F.3d 339, 358 (6th Cir. 2005). If the Supreme Court has not addressed the petitioner's specific claims, a reviewing district court cannot find that a state court acted contrary to, or unreasonably applied, Supreme Court precedent or clearly established federal law. *Carey v. Musladin*, 549 U.S. 70, 77 (2006); *see White v. Woodall*, 572 U.S. 415, 426 (2014) ("Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not

19

require state courts to extend that precedent or license federal courts to treat the failure to do so as error.").

In determining whether the state court's decision involved an *unreasonable application* of law, the Court uses an objective standard. *Williams*, 529 U.S. at 409. "A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fair-minded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)); *see also Bray v. Andrews*, 640 F.3d 731, 738 (6th Cir. 2011). "A state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

**Discussion**

*1.     Ground one is procedurally defaulted*

In his first ground, Black asserts that his appellate counsel was ineffective for not raising three assignments of error. Doc 1, at 5; Doc. 1-1, at 9, 13–15. Consistent with Ohio's requirements, Black raised his ineffective assistance claims in his application under Rule 26(B) to reopen his appeal. *See Hoffner v. Bradshaw*, 622 F.3d 487, 504 (6th Cir. 2010) ("Under Ohio law, a claim of ineffective assistance of appellate counsel must be raised as part of an Ohio Appellate Rule 26(B) motion to reopen an appeal before the Ohio Court

of Appeals."). But the Ohio court of appeals held that Black's application was "untimely on its face" and rejected his arguments that he could establish cause for the late filing. *Black*, 2020 WL 3118903, at *1.

When faced with this situation, the Sixth Circuit has held that because "'the time constraints of Rule 26(B) were firmly established and regularly followed,'" a habeas petitioner whose Rule 26(B) application was rejected as untimely had "procedurally defaulted his claims of ineffective assistance of appellate counsel." *Hoffner*, 622 F.3d at 505 (quoting *Parker v. Bagley*, 543 F.3d 859, 861 (6th Cir. 2008)); *see Landrum v. Mitchell*, 625 F.3d 905, 917 (6th Cir. 2010) ("because Landrum's Rule 26(B) motion was filed beyond the ninety-day period, we conclude that he has procedurally defaulted his ineffective assistance of appellate counsel claim"). The same result should follow here.

To be sure, the court of appeals also alternatively held that "that Black's assignments of error do not present a genuine issue as to whether he was deprived of the effective assistance of appellate counsel." *Black*, 2020 WL 3118903, at *1. But because a state does not waive a procedural default in a situation in which a state court alternatively rejects a defaulted claim on the merits, the appellate court's alternative holding does change the analysis. *See*

21

*Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)[5]; *Scott v. Mitchell*, 209 F.3d 854, 866 (6th Cir. 2000).

Black could escape this default by showing cause and that he suffered actual prejudice by the alleged constitutional error. *Maupin*, 785 F.2d at 138. He could also show that a fundamental miscarriage of justice will result if his claim is not considered. *Coleman*, 501 U.S. at 750. This latter "narrow exception" is reserved for petitioners who "can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense." *Dretke v. Haley*, 541 U.S. 386, 388 (2004).

Here, Black asserts in his traverse that delays in his prison's mail and the prison's failure to follow its own procedures constitute cause. *See* Doc. 13, at 8–9; *see also* Doc. 9-1, at 305–06. Respondent filed a reply to Black's traverse, but says nothing about Black's claimed mailing delays or whether those delays could constitute cause. *See* Doc. 14, at 2–4. So Black's assertion is undisputed. And because the facts Black asserts are sufficient to establish cause, *see*

---

[5]    In *Harris*, the Court said:

> A state court need not fear reaching the merits of a federal claim in an alternative holding. By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.

489 U.S. at 264 n.10.

*Henderson v. Palmer*, 730 F.3d 554, 560 (6th Cir. 2013), the Court must consider prejudice.

Black argued that his appellate counsel was ineffective for failing to raise three assignments of error on appeal:

> 1. The prosecution engaged in misconduct by making inaccurate statements and asking leading questions that deprived Black of a fair trial.
>
> 2. There was insufficient evidence to support a conviction.
>
> 3. The convictions were against the manifest weight of the evidence because the verdicts were inconsistent.

Doc. 9-1, at 138.

As to the first argument about prosecutorial misconduct, Black pointed to five statements. *See id.* at 143–45. The first allegedly problematic statement was a portion of the prosecutor's opening in which he explained the expected the lack of precision in T.S.'s "timeline" by saying that T.S. had a "slight cognitive impairment" and that "she communicates using a touch screen board." Doc. 9-1, at 143. Black argued that neither of these assertions were true. *Id.* But Black's argument ignored the fact that T.S.'s speech language pathologist testified that T.S. "does have [a] mild impairment." Doc. 9-2, at 695. The pathologist also affirmed that due to T.S.'s motor speech impairment, *id.* at 696, she "set [T.S.] up with a touch pad and things like that to help her communicate," *id.* at 697. So Black's factual premise was mistaken and counsel could not have been ineffective for not raising the issue. *See Coley v. Bagley*,

23

706 F.3d 741, 752 (6th Cir. 2013) ("[o]mitting meritless arguments is neither professionally unreasonable nor prejudicial").

The second statement also concerned the prosecutor's opening statement, in which the prosecutor said that the evidence would show that "after church, [T.S.] discloses what happened to her boyfriend." Doc. 9-1, at 144. As it turned out, however, although the prosecution asked T.S.'s boyfriend whether T.S. "was … able to tell [him] what happened to her or did she just say something bad happened to her," her boyfriend merely said that T.S. reported "something bad" [had] happened to her. Doc. 9-2, at 684–85. As a result, during closing arguments, the prosecutor accurately stated that T.S. told her boyfriend that "something bad [had] happened to her." Doc. 9-2, at 999.

At worst, this circumstance reflects the prosecution promising more than it could deliver. And that could only benefit Black. *See* Michael J. Ahlen, Opening Statements in Jury Trials: What Are the Legal Limits?, 71 N.D. L. Rev. 701, 718 (1995) ("attorneys lose credibility if they over-promise"). Moreover, the prosecution correctly described T.S.'s boyfriend's testimony during closing and the trial court instructed the jury that opening statements were not evidence. Doc. 9-2, at 659. So counsel's decision not to raise this issue could not have prejudiced Black. *See United States v. Campbell*, 317 F.3d 597, 606–07 (6th Cir. 2003); *see also Frazier v. Cupp*, 394 U.S. 731, 736 (1969) ("Many things might happen during the course of the trial which would prevent

the presentation of all the evidence described in advance. Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given.").

The third and fourth statements are questions that the prosecutor asked T.S. and which Black claimed were leading. *See* Doc. 9-1, at 144. The prosecutor asked: "So let me ask, do you remember the incident where you were asleep in your bed and your stepfather came into the room?" Doc. 9-2, at 772. Shortly thereafter, he asked: "So with that kind of background, I'd like you to tell the jury what it was that your stepfather, Mr. Black, did to you while you were asleep that prompted you tell [a teacher] about it." *Id*. at 773.

Black's argument to the court of appeals, however, ignored the context and the law. In context, it was evident that the prosecution's examination presented some difficulties for T.S. The trial court first tried to interject to assist, *see* Doc. 9-2, at 771 ("Let me - -"), and after two more questions, the trial court directed counsel to participate in a side bar conversation, *id*. The record doesn't reflect what was said during the side bar, but the prosecutor immediately apologized to T.S., said it was his fault, and proceeded "to go back and unpack some things so you don't have to talk about so much at once." *Id*. Without objection, the prosecutor began to ask a series of leading questions, including those about which Black complained in his application to reopen.

25

Given what occurred, it is plain that the trial court and the parties discussed how to examine T.S. And that discussion evidently included the use of leading questions, which is a matter largely left to the trial judge's judgment.[6] *See United States v. Kuehne*, 547 F.3d 667, 692 n.8 (6th Cir. 2008); *cf. State v. Jackson*, 751 N.E.2d 946, 962 (Ohio 2001) (because "it is within the trial court's discretion to allow leading questions on direct examination[,] ... we do not find that the failure to object to any leading questions constitutes ineffective assistance of counsel").

Further, even putting the context aside, Ohio's Eighth District Court of Appeals—the court in which Black filed his application to reopen—has held that "it is wholly within the trial judge's discretion to permit the state to ask leading questions of its own witness." *State v. Rosa*, 2020-Ohio-3964, 2020 WL 4533616, at *3 (Ohio Ct. App. 2020). Moreover, because "the failure to object to leading questions in direct examination almost never rises to the level of ineffective assistance of counsel," *id*, the failure to raise the issue on appeal could not constitute ineffective assistance, *cf. Jones v. Barnes*, 463 U.S. 745, 751, (1983) ("Appellate counsel is not required … to raise every 'nonfrivolous point[] requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.'"); *Greer v. Mitchell*, 264 F.3d 663, 676 (6th

---

[6]     The Constitution does not prohibit the use of leading questions on direct examination. *United States v. Kuehne*, 547 F.3d 667, 692 n.8 (6th Cir. 2008).

26

Cir. 2001) ("appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit").

Additionally, because trial counsel raised no objection, if appellate counsel had raised an issue related to the leading questions, counsel would have been faced with the need to demonstrate plain error. And that would have required counsel to demonstrate that "a manifest miscarriage of justice" would result if the alleged error were not noticed. *State v. Jenks*, 574 N.E.2d 492, 509 (Ohio 1991), *superseded on other grounds, as stated in State v. Worley*, 174 N.E.3d 754, 769 (Ohio 2021). It would also have required counsel to show that "but for the error, the outcome at trial would have been different." *Id*. Black, however, doesn't explain how counsel could have overcome these hurdles. So counsel's failure to challenge the prosecutor's questions could not have prejudiced Black.

Finally, Black pointed to the prosecutor's closing argument in which she argued: "You either believe T.S. and you believe her testimony and you find her credible or she deserves an Oscar. You either believe her or she deserves an academy award for best actress." Doc. 9-1, at 145.

To be sure, a prosecutor may not vouch for a witness or "express a personal belief that a particular witness is lying" or telling the truth. *Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005). But that's not what the prosecutor did. She instead recognized that the state's case rested on whether the jury believed T.S. Indeed, defense counsel's opening statement, Doc. 9-2, at 678–81,

and closing argument, *id*. at 1004–14, focused on the reasons the jury should not believe T.S., thus confirming that the case came down to the jury's assessment of T.S.'s credibility. And framed as a question of T.S.'s credibility, the case came down to whether the jury believed T.S. was lying or telling the truth, which is why the state "submit[ed] that her testimony … was not an act." Doc. 9-2, at 988. Because the prosecutor's argument was not improper, Black was not prejudiced by his counsel failure to raise an issue related to the prosecutor's closing. *Cf. United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996) ("Where there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying.").

The result is the same as to counsel's failure to raise insufficiency or manifest weight of the evidence arguments. Black's arguments as to these matters focused on the lack of witnesses and the alleged lack of physical or DNA evidence. Doc. 9-1, at 145–47. But in Ohio, when an appellant raises a sufficiency argument, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. McFarland*, 164 N.E.3d 316, 323 (Ohio 2020) (citation omitted). Given this deferential standard, it's been said that "sufficiency of the evidence" challenges are "seldom successful[.]" *United States v. Zambrano*, 776 F.2d 1091, 1094 (2d Cir. 1985). Indeed, a rape victim's "testimony satisfies the [sufficiency] test," even if uncorroborated. *State v.*

*Johnson*, 858 N.E.2d 1144, 1158 (Ohio 2006). And T.S. supplied that testimony. Doc. 9-2, at 791–96. So Black suffered no prejudice from counsel's failure to raise a sufficiency issue.

As to manifest weight, although habeas courts often find the issue subsumed—for purposes of habeas review—in a sufficiency argument, *see Thompson v. Harris*, No. 4:18-cv-2103, 2020 WL 5810020, at *9 (N.D. Ohio Sept. 30, 2020), Ohio courts have explained that manifest-weight analysis is distinct and requires the appellate court to "weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Scott*, 800 N.E.2d 1133, 1140 (Ohio 2004). In his application to reopen, Black argued that his rape conviction was inconsistent with his acquittal on the charge of gross sexual imposition. Doc. 9-1, at 146–47. He thus claimed that the "jury lost its way." *Id.* at 147. Allegedly inconsistent verdicts do not, standing alone, support a manifest weight argument, however. *See State v. Taylor*, 2008-Ohio-1626, 2008 WL 885822, at *1–2 (Ohio Ct. App. 2008); *see also State v. Gardner*, 889 N.E.2d 995, 1013–14 (Ohio 2008); *State v. Adams*, 374 N.E.2d 137, 140 (Ohio 1978),

*vacated in part on other grounds*, 439 U.S. 811 (1978).[7] So raising a manifest-weight argument would have availed Black of nothing. He was thus not prejudiced by his counsel's failure to raise the issue.

Black procedurally defaulted his first ground. Although he's shown cause for the default, he has not shown that he suffered actual prejudice from the constitutional error that he alleged. The Court should thus reject Black's first ground.

### 2. *Black procedurally defaulted his second ground for relief*

If a habeas petitioner "fail[s] to fairly present federal claims to the state courts, and a state procedural rule now prohibits the state court from considering them, the claims are considered procedurally defaulted." *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009). Although a petitioner in that situation might have "technically satisfied" "the exhaustion requirement[,] … the petitioner's failure to have the federal claims considered in the state courts results in a procedural default of those claims that bars federal court review."

---

[7]    In *Adams*, the Ohio Supreme Court explained that:

> [t]he several counts of an indictment containing more than one count are not interdependent. A verdict responding to a designated count will be construed in the light of the count designated, and no other. An inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count.

374 N.E.2d at 140 (citation omitted).

*Id.*; *see Seymour v. Walker*, 224 F.3d 542, 549–50 (6th Cir. 2000) ("When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review.").

"In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal." *Williams*, 460 F.3d at 806; *see Gerth v. Warden, Allen Oakwood Corr. Inst.*, 938 F.3d 821, 830 (6th Cir. 2019) (explaining that Ohio courts enforce res judicata). As a result, "if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised on direct appeal, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806; *see Hicks v. Collins*, 384 F.3d 204, 211 (6th Cir. 2004).

Black's second ground for relief is that the prosecution violated his "constitutional right to a fair trial when [it] engaged in an erroneous pattern of misconduct." Doc. 1, at 7. He claims that "throughout the trial," the prosecution engaged in various prohibited practices, including "lead[ing] witnesses, supply[ing] and provid[ing] witnesses answers, bring[ing] up prior bad acts and pending charges in which no guilty finding had been made, incit[ing] the passions and prejudices of the jury, and further assert[ing] their

31

own opinion as to the Witnesses credibility thus [vouching] for the witnesses credibility." *Id.*

Black has never presented this issue to any Ohio court. He neither raised it in in his initial appeal nor in any other manner. It is true that in his pro se application to reopen his direct appeal, Black asserted that "[t]he prosecution engaged in misconduct by making inaccurate statements and asking leading questions that deprived Black of a fair trial." Doc. 9-1, at 138; *see id.* at 345–50 (making the same argument in an appeal to the Ohio Supreme Court). But Black made this claim in the context of his ineffective-assistance-based petition to reopen his appeal. Doc. 9-1, at 138. Indeed, the court of appeals disposed of Black's argument by finding that his petition was untimely and, alternatively, that Black hadn't "present[ed] a genuine issue as to whether he was deprived of the effective assistance of appellate counsel." *Black*, 2020 WL 3118903, at *1. So Black has never presented his prosecutorial-misconduct claim to any Ohio court. And Ohio's res judicata rule would bar Black from raising the argument now. *See Gerth*, 938 F.3d at 830. As a result, this claim is procedurally defaulted. *Williams*, 460 F.3d at 806.

Black says nothing about cause and prejudice as to his prosecutorial misconduct claim. Instead, he claims that he preserved the claim when he raised it "within" his application under Rule 26(B) to reopen his appeal. Doc. 13, at 20. But Black is mistaken. A Rule 26(B) application is a vehicle to raise ineffective assistance of appellate counsel; it doesn't function to preserve

merits arguments. *See Davie v. Mitchell*, 547 F.3d 297, 312 (6th Cir. 2008) ("a Rule 26(B) application 'based on ineffective assistance cannot function to preserve' the underlying substantive claim"). The Court should thus reject Black's second ground for relief.

### 3. *Black's third ground fails on the merits*

Black's third ground is that the evidence was legally insufficient to sustain his rape and kidnapping convictions. Doc. 1, at 8. He adds that "the evidence does not weigh beyond a reasonable doubt" and "[t]he State of Ohio's legal reason for affirming [his] convictions is in conflict with the verdict itself and the jury's reasoning reaching the verdict." *Id.*

As an initial matter, Respondent Warden argues that Black is raising an argument that his convictions are against the manifest weight of the evidence, which is not cognizable in a federal habeas forum. Doc. 9, at 39. To a certain extent, Respondent has a point. In his direct appeal Black did not present a sufficiency argument.[8] Instead, he argued that "[t]he manifest weight of the evidence should have led to an acquittal, and did not, causing a manifest miscarriage of justice." Doc. 9-1, at 47. And, as Respondent notes, manifest-weight-of-the-evidence claims are state-law issues that are not

---

[8] Black argued in his application to reopen that his appellate counsel was ineffective for not arguing sufficiency of the evidence. Doc. 9-1, at 145–46. But as noted with respect to ground two, Black's argument in his application to reopen did not preserve the underlying merits of his sufficiency argument. *See Davie*, 547 F.3d at 312.

cognizable in federal habeas proceedings.[9] Doc. 9, at 40; *see Johnson v. Havener*, 534 F.2d 1232, 1234 (6th Cir. 1976).

On the other hand, however, the Sixth Circuit has held that a manifest-weight-of-the-evidence claim presented on direct review to an Ohio court of appeals is sufficient to preserve an insufficient evidence argument. *Nash v. Eberlin*, 258 F. App'x. 761, 765 (6th Cir. 2007). So Respondent's assertion is not well-taken.

As to this issue, Black argues that the only evidence that supported the verdict was T.S.'s testimony, which he says was contradicted by other evidence. Doc. 1-1, at 17. And in his traverse, Black presents an extended discussion of the facts, Doc. 13, at 36–51, before asserting that the evidence was insufficient because the "sole evidence" was T.S.'s testimony, which "was contradicted sufficiently to undermine the conviction," *id*. at 52.

The problem for Black is that this Court does not review sufficiency challenges de novo. Instead, when reviewing a claim that a petitioner's

---

[9]  A manifest-weight-of-the-evidence claim presents an issue of state law. Under Ohio law, "[w]eight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'… When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompson*, 678 N.E.2d 541, 546–47 (Ohio 1997) (citations omitted). But a federal habeas court can't "reweigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court" because, in habeas proceedings, "[i]t is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony." *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) (citations omitted).

34

conviction is not supported by sufficient evidence, the Court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This "standard 'gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Jackson*, 443 U.S. at 319). In applying the standard, the court defers to the trier-of-fact's determination. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). The court does "not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the [fact-finder]." *Id.*; *see also Matthews*, 319 F.3d at 788.

On federal habeas review, an additional layer of deference applies. *Brown*, 567 F.3d at 205; *see Coleman v. Johnson*, 566 U.S. 650, 651 (2012). First, the Court defers "to the trier-of-fact's verdict, as contemplated by *Jackson*." *Davis*, 658 F.3d at 531. And second, the Court defers under the 1996 Act to the state courts' "consideration of the trier-of-fact's verdict." *Id*. So even if this Court would conclude in the first instance that a rational trier-of-fact could not have found Black guilty beyond a reasonable doubt, the Court "must still defer to the state appellate court's sufficiency determination as long as it

is not unreasonable."[10] *Brown*, 567 F.3d at 205; *see also White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009). This doubly deferential "standard erects 'a nearly insurmountable hurdle' for petitioners who … seek habeas relief on sufficiency-of-the-evidence grounds." *Keys v. Booker*, 798 F.3d 442, 450 (6th Cir. 2015) (quoting *Davis*, 658 F.3d at 534)).

Here's what the Ohio court of appeals had to say about Black's manifest-weight argument:

> {¶ 40} Black was convicted of rape in violation of R.C. 2907.02(A)(2), which provides that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2907.01(A) defines "sexual conduct" as "the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another." Under R.C. 2901.01(A)(1), "force" is "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."
>
> {¶ 41} Black was also convicted of kidnapping in violation of R.C. 2905.01(A)(4). This statute provides that "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o engage in sexual activity * * * with the victim against the victim's will." R.C. 2905.01(A)(4). "Sexual activity" is sexual conduct or sexual contact, or both. R.C. 2907.01(C). "Sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a

---

[10]   Because the Ohio court of appeals' "determination … that [Black's] conviction was supported by the manifest weight of the evidence necessarily implies a finding that there was sufficient evidence," *Nash*, 258 F. App'x at 765, this Court defers under the 1996 Act to that court's resolution of Black's manifest-weight argument.

female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 42} Here, *T.S. testified that on August 4, 2016, her stepfather grabbed her by the arm as she was walking down the stairs and pulled her into his bedroom and raped her. She stated that Black "kept grabbing at [her]," and she repeatedly told Black to "get off [her] and "leave [her] alone." She further stated that Black put her on the bed, took off her shorts and underpants as well as his shorts, and he "stuck his penis in [her] vagina." T.S. testified that while she attempted to get away, ultimately, she was not strong enough to fight off her stepfather.*

{¶ 43} It is well settled that a rape conviction may rest solely on the victim's testimony, if believed, and there is no requirement that a rape victim's testimony be corroborated. *State v. Castellon*, 8th Dist. Cuyahoga No. 106813, 2019-Ohio-628, 2019 WL 856246, ¶ 41; *State v. Magwood*, 8th Dist. Cuyahoga No. 105885, 2018-Ohio-1634, 2018 WL 1975892, ¶ 32; *State v. Patterson*, 8th Dist. Cuyahoga No. 100086, 2014-Ohio-1621, 2014 WL 1513893, ¶ 40; *State v. Butts*, 8th Dist. Cuyahoga No. 55549, 1989 WL 80969, 2 (July 20, 1989) (stating that a lack of physical evidence "does not require reversal since a victim's testimony, if believed, is sufficient to obtain and sustain a rape conviction"); *State v. Timmons*, 10th Dist. Franklin Nos. 13AP-1038 and 13AP-1039, 2014-Ohio-3520, 2014 WL 4049815, ¶ 23 (stating that physical or forensic evidence is not required to prove rape).

{¶ 44} T.S.'s testimony, however, was also supported by the testimony of other witnesses. T.S.'s stepmother, Hatcher, testified that she received a text message from T.S. on August 5, 2016, stating that she needed to talk to Hatcher about something "serious" that happened to her "last night." And Hatcher testified that when T.S.'s sister drove T.S. to her stepmother and father's house, T.S. was upset and "scared to talk." Further, T.S.'s friend, Kincaid, testified that on August 7, 2016, when he and his

> grandmother picked T.S. up for church, she was
> upset and crying and she told him "something bad"
> happened to her a couple of days prior. Then on
> August 15, 2016, T.S.'s stepmother and father drove
> T.S. to the police station where T.S. reported she had
> been raped by her stepfather.
>
> {¶ 45} In light of the foregoing, and in resolving any
> purported conflicts in the evidence, we cannot find
> the jury clearly lost its way and created such a
> manifest miscarriage of justice that Black's
> conviction for rape and kidnapping must be reversed
> and a new trial ordered. This case is therefore not
> the exceptional case in which the evidence weighs
> heavily against the conviction.

*Black*, 149 N.E.3d at 1141–42 (emphasis added).

Considering (1) this determination, (2) the fact—noted by the court of appeals, *id.* at 1142—that in Ohio, a rape victim's testimony alone is enough to satisfy the sufficiency test, even if uncorroborated, *Johnson*, 858 N.E.2d at 1158, and (3) the fact that, contrary to Black's assertion, T.S.'s testimony "was also supported by the testimony of other witnesses," *Black*, 149 N.E.3d at 1142, *see* Doc. 9-2, at 791–96, it is plain that Black's argument barely gets out of the starting gate. Under *Jackson*, a reviewing court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. One need only to review T.S.'s testimony, as recited by the court of appeals and emphasized above, to know that (1) "any rational trier of fact could have found the essential elements of

38

the crime beyond a reasonable doubt," and (2) a court could only reach Black's conclusion by ignoring that testimony.

The Court should reject Black's third ground.

## Conclusion

For all the reasons set forth above, I recommend that Black's petition be denied.

Dated: October 3, 2023

　　　　　　　　　　　　　*/s/ James E. Grimes Jr.*　　　　　
　　　　　　　　　　　　　James E. Grimes Jr.
　　　　　　　　　　　　　U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within14 days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019).